UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 06-10038-GAO

UNITED STATES OF AMERICA

v.

RICARDO KNIGHT

MEMORANDUM AND ORDER
July 26, 2006

O'TOOLE, D.J.

The defendant, Ricardo Knight, is accused in a one count indictment of knowingly possessing a firearm, having previously been convicted on a felony, in violation of 18 U.S.C. § 922(g)(1). He has moved to suppress all evidence, including the firearm at issue, derived from his encounter with officers assigned to the Boston Police Department's Youth Violence Strike Force on January 2, 2006. For the reasons set forth herein, I conclude that there is no need for an evidentiary hearing on this motion and that Knight's Fourth Amendment rights were not violated.

## An Evidentiary Hearing is Not Required

A criminal defendant does not have an absolute or presumptive right to an evidentiary hearing on a suppression motion. See, e.g., United States v. Lewis, 40 F.3d 1325, 1332 (1st Cir. 1994). An evidentiary hearing is only required if a movant makes an initial showing that facts material to the resolution of the motion are in dispute. He can do this by alleging facts that are "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." Id. Knight has not made such a threshold showing here. This case involves the warrantless seizure of a weapon from Knight's person. Thus, the Fourth Amendment analysis

depends heavily on the facts and circumstances surrounding Knight's encounter with the police officers. The government has submitted detailed sworn testimony (in the form of grand jury testimony and an affidavit) from the two officers involved in the entire encounter with Knight, the police incident report written by one of those officers, and a detective's affidavit and report summarizing an interview of Knight conducted after his arrest in which he made certain statements about his encounter with the police. This evidence provides a detailed picture of the facts and circumstances of the encounter between Knight and the officers.

Knight was aware of this account from these sources when he filed his motion to suppress, previously having been provided with the grand jury testimony and police report. His two-line affidavit, however, fails to dispute any of the statements of fact made in the government's materials. Knight's perfunctory statements that he is the defendant in this case and that "On January 2, 2006, I was stopped, restained [sic], and searched by Boston Police Officers at 279 Centre Street [and that] I did not consent to a search of my person" do nothing to contest the government version of events. The government does not argue that Knight consented to a search of his person. Nor does the government contest that eventually Knight was restrained and that during the process of restraining him an officer felt a firearm that was subsequently retrieved from Knight's person. Rather, the government argues that the facts and circumstances of the encounter with Knight justified their actions, making them reasonable under the relevant Fourth Amendment standards. Knight's affidavit does nothing to place the key facts and circumstances in dispute.[1] Therefore, an evidentiary hearing is not required.

---

[1] Knight's counsel's unsworn *argument* is not sufficient to create a dispute of fact necessitating an evidentiary hearing.

**Factual Background**

The following recitation of the relevant facts underlying the encounter between police and Knight on January 2, 2006 is drawn from the sworn accounts of the two officers who were on scene for the entire encounter (specifically the grand jury testimony of Officer Frank McLaughlin and the affidavit of Sergeant John Fitzgerald), the police incident report completed by Officer McLaughlin, the affidavit and report of Detective Robert Fratalia, who conducted an interview with Knight after his arrest, as well as the affidavit submitted by Knight.

On January 2, 2006 at approximately 5:15 P.M., various members of the Boston Police Department's Youth Violence Strike Force ("the YVSF") were conducting a "directed patrol"[2] in the Bromley-Heath housing project in the Jamaica Plain section of Boston, monitoring the area for gang and drug activity. As their vehicle turned onto Centre Street, Officer McLaughlin and the other officers traveling with him heard a single gunshot and radioed to the other units participating in the "directed patrol," which led various YVSF units to converge around the building located at 279 Centre Street. That building is a residential building that had been identified by Boston Police as a "red zone," having been the location of an unusually high number of firearms-related incidents and a large amount of reported criminal activity, usually in the late afternoon and early evening.

Officers on scene observed a black male wearing a black hat take off running. When they lost sight of him, they surmised he may have entered 279 Centre Street. Officer McLaughlin and Sergeant Fitzgerald entered that building to speak to two persons standing in the entryway, one of whom appeared to match partially the description of the individual who had run away upon the officers'

---

[2] This term is used to describe operations in which large numbers of police officers are sent into identified trouble spots or "red zones" for a brief period of time in order to saturate the area and increase the overall police presence in the area.

arrival.  Once they entered the building, the officers quickly ascertained that neither of these persons was the one they were looking to speak with.  Sergeant Fitzgerald then went around the corner in order to determine whether there was anyone else located in the hallway.

It was at this point that Knight first appeared.  He came rapidly down the stairs and pushed past Sergeant Fitzgerald.  Knight was headed directly in the direction of Officer McLaughlin who, wishing to avoid a collision with Knight (because he was holding a cup of hot tea in his hand), instinctively put his free hand up to stop Knight's progress toward him and create separation.  In doing so, Officer McLaughlin felt, through the tee shirt and light jacket Knight was wearing, that Knight's heart was pounding very hard in his chest.  Officer McLaughlin initially told Knight to relax and identified himself as a police officer.  He was clad in plain clothes and wearing his badge around his neck while Sergeant Fitzgerald, who had come back around the corner to see what was happening, was wearing a YVSF jacket.  Sergeant Fitzgerald asked Knight whether he lived in 279 Centre Street, to which Knight replied "No."  Officer McLaughlin commented to Knight that his heart was beating extremely fast and asked him if he was all right, whether something was wrong, and whether Knight had something to be nervous about.  Knight simply responded with one word negative responses to these inquiries.  When Sergeant Fitzgerald asked Knight whether he had anything on him that would make him nervous, Knight put his hand near his right front pants pocket and attempted to force his way past the officers.[3]

Based on Knight's nervous demeanor and hand movement toward his pocket, Officer McLaughlin and Sergeant Fitzgerald took steps to secure Knight's hands.  They first ordered Knight

---

[3] Knight admitted during a post-arrest interview that he had become nervous upon encountering the officers because he was carrying a firearm and had pulled his coat down in an attempt to cover the front pants pocket where it was held.

to keep his hands away from his pockets and to put them behind his back. When he refused to comply, a physical struggle ensued. Officer McLaughlin and Sergeant Fitzgerald ended up going to the ground with Knight in their struggle to secure his hands, as he continued to try to reach his pocket with the one hand the officers could not secure. It took additional officers and the threat by one officer to use pepper spray before Knight eventually complied with the order to place both his hands behind his back. During the struggle with Knight, Sergeant Fitzgerald had felt what appeared to be a firearm in Knight's right front pants pocket. Once Knight was secured on the ground, another officer removed a loaded handgun with an obliterated serial number from that pocket.[4] An officer who arrived on scene and who had regularly patrolled the area immediately recognized Knight and stated that he was subject to a Boston Housing Authority "No Trespass" order which forbade him from being on the premises under penalty of immediate arrest. Knight was then arrested on multiple charges and transported to a local police station where, after signing a waiver of his Miranda rights, he subsequently submitted to an interview.

As noted previously, Knight states in his affidavit only that he "was stopped, restained [sic], and searched by Boston Police Officers at 279 Centre Street" and that he "did not consent to a search of [his] person."

### Knight's Fourth Amendment Rights Were Not Violated

Knight contends that he was improperly seized by the police in violation of the Fourth Amendment. The principal issue is whether his physical detention and the attendant search of his person can be justified as an investigative stop under the doctrine of Terry v. Ohio, 392 U.S. 1 (1968).

---

[4] The officers also recovered a knife from one of Knight's pants pockets.

5

Knight argues that he was effectively seized from the first moment he encountered the officers. On the facts presented, that argument is untenable. Instead, it appears that Knight was not seized until the point when the police attempted to control his hands first by orally ordering him to place them behind his back and then by attempting to physically restrain him. "While the Fourth Amendment protects against unreasonable searches and seizures, not all encounters between law enforcement officers and citizens constitute seizures." See United States v. Smith, 423 F.3d 25, 28 (1st Cir. 2005); see also United States v. Mendenhall, 446 U.S. 544, 554-55 (1980) ("characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices"). Law enforcement officers do not seize an individual when they merely approach that person in a public space and ask questions, even though such questioning might make that individual feel subjectively uncomfortable. See Smith, 423 F.3d at 28; United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997); see also Mendenhall, 446 U.S. at 554-55. In the absence of a clear physical restraint of movement, the relevant inquiry is whether an objectively reasonable person, faced with all of the circumstances attending the encounter, would believe they are not free to leave. See Mendenhall, 446 U.S. at 554-55; Smith, 423 F.3d at 28-29; see also United States v. Drayton, 536 U.S. 194, 200-06 (2002). A non-exhaustive list of the types of circumstances that could lead to a conclusion that an encounter was coercive, and thus a seizure in the Constitutional sense, includes (1) the threatening presence of several officers, (2) the display of a weapon by an officer, (3) some physical touching of the citizen, and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See Mendenhall, 446 U.S. at 554. However, "this list of factors is not exhaustive and no single factor is dispositive in any case.

'[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" Smith, 423 F.3d at 29 (quoting Florida v. Bostick, 501 U.S. 429, 439 (1991)).

It is clear that Knight was seized at the point the officers physically struggled with him in an attempt to control his hands. I also conclude that he was seized, under the standards just set forth, at the point when the officers commanded him to keep his hands away from his pocket and put them behind his back, which it appears preceded the physical struggle for at least a brief period of time. On the other hand, until Knight reached for his pocket and the officers began their attempts to restrain his hands, the encounter was not characterized by such coercion that an objectively reasonable person would not feel free to leave. The officers did not seek out or approach Knight. Rather, their encounter began when he pushed past one officer and almost ran into another. The physical contact between Officer McLaughlin and Knight was incidental and was intended to prevent a collision between the two individuals, not to detain Knight. The officers' questions to Knight were informal and not accusatory in nature, mainly serving the purpose of identifying themselves and attempting to ascertain why Knight was so agitated. Although Knight later admitted he became nervous upon encountering the officers because he knew he was carrying a gun, an objectively reasonable person in Knight's situation would not have felt they were under interrogation and not free to leave based on the questions asked. The officers did identify themselves as police but were not dressed in uniform and did not display any weapons, with one officer instead holding a cup of tea in his hand. Knight argues that the police did not communicate to him that he was free to leave. However, an explicit

7

statement to that effect is not necessary. See United States v. Manjarraz, 348 F.3d 881, 886 (10th Cir. 2003); cf. Drayton, 536 U.S. at 203 (Court of Appeals erred in adopting an approach that "would suppress any evidence obtained during suspicionless drug interdiction efforts aboard buses in the absence of a warning that passengers may refuse to cooperate"). Additionally, Knight seems to imply in his motion that he was physically detained as soon as he encountered the officers. To the extent this purports to dispute the account of the encounter given by the officers, Knight provides no evidentiary support to create a material dispute of fact on this point.[5]

The government argues that the seizure of Knight was justified under the "reasonable suspicion" standard applicable to investigative stops. An investigative stop is permissible under *Terry* and its progeny when a law enforcement officer, acting on reasonable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion. See United States v. Maguire, 359 F.3d 71, 76-79 (1st Cir. 2004); Young, 105 F.3d at 6-8. It is also permissible for an officer to conduct a patdown search, or "frisk," of a citizen when the officer has a reasonable belief he is dealing with an armed or otherwise dangerous individual. See Terry, 392 U.S. at 27, 30; Maguire, 359 F.3d at 78; Young, 105 F.3d at 7. There are two aspects of the *Terry* inquiry. First, the government must demonstrate that there were "specific and articulable facts" which, taken together with the reasonable inferences an experienced officer would make therefrom, show that the officer was warranted in initiating the intrusion that is challenged. See Maguire, 359 F.3d at 76-77; Young, 105 F.3d at 6-7. Second, the government must show that the action taken by the officers was reasonably related in scope to the circumstances which justified initiating the interference. See Maguire, 359 F.3d at 76-

---

[5] Knight's vague and conclusory assertion in his affidavit that he was "stopped, restained [sic] and searched by Boston Police officers on January 2, 2006" is just as consistent with the government's detailed factual support as it is with his counsel's argument to the contrary.

77; Young, 105 F.3d at 6-7. Applying that analysis here leads to the conclusion that the officers' actions were reasonable under the Fourth Amendment.

The determination of whether an officer had "reasonable suspicion" to initiate the investigative stop requires a consideration of the totality of all the relevant circumstances known to the officer at the time the stop was made. See Maguire, 359 F.3d at 76 ("In evaluating the validity of a *Terry* stop, we consider the totality of the circumstances, mindful that the concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of rules.") (internal quotations and citations omitted); see also United States v. Sokolow, 490 U.S. 1, 7 (1989) (officers "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch") (internal quotations and citations omitted). As noted, an officer may conduct a pat-down search of a citizen when the officer is justified in believing that the person searched is armed and dangerous to the officer or others. See Maguire, 359 F.3d at 78 ("[a] pat-frisk can be an integral part of a *Terry* stop"); Young, 105 F.3d at 7; see also Terry, 392 U.S. at 27 (allowing a police officer to conduct a "reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime").

Here, the officers' oral commands and physical attempts to restrain Knight's hands and keep them away from his pocket were justified by specific and articulable facts that would lead the officers to have a reasonable suspicion that Knight could be armed and a danger to the officers or the other two young men standing nearby. Specifically, at the time they ordered Knight to put his hands behind his back, the officers knew: (1) that they had heard a gunshot in the area minutes earlier; (2) that their YVSF unit had been assigned to conduct a "directed patrol" in the Bromley-Heath housing complex

because it was a high crime area; (3) that an individual had fled upon the approach of some of the officers and, although the officers lost visual contact with him, circumstances led the officers to believe that individual might be inside 279 Centre Street; (4) that the 279 Centre Street building had been identified as a "red zone" due to an unusually high number of firearms incidents in it and was an area where there had been a large amount of criminal activity in the late afternoon and early evening, around the same time their encounter with Knight occurred; (5) that Knight had come rapidly down the stairs, pushed Sergeant Fitzgerald aside, and nearly collided with Officer McLaughlin; (6) that Knight was exhibiting a nervous demeanor and elevated heart rate; and (7) that Knight rapidly moved his hand toward his right front pants pocket when asked if he had anything on him making him nervous.  Under these circumstances, Officer McLaughlin and Sergeant Fitzgerald, both members of a special division of the Boston Police dedicated to combating youth violence, could reasonably have suspected that Knight was armed and dangerous.

The second part of the inquiry is whether the scope of the investigative stop was reasonably related to the circumstances which justified the interference in the first place or whether the actions of the police officers had crossed the line into *de facto* arrest.  See Maguire, 359 F.3d at 77.  Physical contact with and restraint of a subject does not mean an encounter necessary falls outside the scope of *Terry*; the relevant question is whether an objectively reasonable person would have believed he was under formal arrest.  Id.  Merely because physical contact is more than *de minimis* does not mean the officers' actions fall outside a permissible *Terry* stop, particularly when officers are attempting to ensure their own personal safety in a reasonable manner.  Id. at 78 (holding that officers' putting suspect to ground to hold down and conduct pat-frisk after observation of what appeared like a knife was permissible and did not amount to *de facto* arrest where the incident occurred on public street

in light of day, lasted a very short time, and did not involve handcuffing of suspect); cf. United States v. Enslin, 327 F.3d 788, 795 (9th Cir. 2003) (holding that marshal's order to non-fugitive individual in home being searched for fugitive to show his hands was "seizure" but was reasonable as a minimal intrusion justified by legitimate concerns of officer safety). For all the reasons previously discussed, the officers had a reasonable suspicion that Knight might be armed and thus were justified in ordering him to keep his hands away from his pocket and to put them behind his back. Similarly, the officers' conduct in struggling physically with Knight and trying to restrain his hands was reasonable in light of this reasonable suspicion, which was undoubtedly heightened by his refusal to comply and continued attempts to reach for the same pocket. See Maguire, 359 F.3d at 78-79; United States v. Stanley, 915 F.2d 54, 57 (1st Cir. 1990) ("In situations such as this, the officer's concern for his own safety and for the safety of others is a legitimate factor in assessing the appropriateness of the action taken. When the officer has a reasonable belief 'that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'")(quoting Terry, 392 U.S. at 24)). Thus, the seizure of Knight in which Sergeant Fitzgerald eventually felt what appeared to be a handgun was reasonable under the Fourth Amendment. Similarly, the action of the officers in reaching into Knight's pocket to remove the weapon Sergeant Fitzgerald had felt while he wrestled to control Knight's hands was within the scope of a permissible limited search to identify weapons. See Terry, 392 U.S. at 29 (the sole justification for a search in the investigative stop situation at issue was to protect the officers from hidden weapons and therefore search must "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs,

or other hidden instruments for the assault of the police officer"); id. at 29-30 (officer's retrieval of weapons from suspects permissible where officer patted down their outer clothing first and "did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns"); see also McGuire, 359 F.3d at 78-79; Young, 105 F.3d at 6-7.

## **Conclusion**

For the foregoing reasons, I conclude that the Knight's Motion to Suppress Physical Evidence (Dk. #16) ought to be, and hereby is, DENIED.

It is SO ORDERED.


July 26, 2006                                             \s\ George A. O'Toole, Jr.
DATE                                                      DISTRICT JUDGE